**Richard AUBERTIN, Plaintiff,**

v.

**COLVILLE CONFEDERATED TRIBES, Defendant.**

**No. C 74–224 Civil.**

United States District Court, E. D. Washington.

Jan. 10, 1978.

Daniel M. Rosenfelt, Edward A. Dawson, Spokane, Wash., for plaintiff.

Ziontz, Pirtle, Morisset, Ernstoff & Chestnut by Alvin J. Ziontz, Seattle, Wash., for defendant.

## OPINION

FITZGERALD, District Judge.

The facts are essentially undisputed. Plaintiff Richard Aubertin is an enrolled member of the defendant Colville Confederated Tribes. Aubertin borrowed $10,034.14 from the Tribes on June 3, 1963 and later obtained additional loans increasing the principal amount by $8,127.12. The Tribes' Credit Committee declared him in default on June 6, 1968 with a balance then owing of $9,487.29.

The loan application on which Aubertin obtained the loan contained an assignment of income from any source accruing to his "Indian Money Account." [1] Aubertin filed

---

1. As additional security for my loan, I hereby assign to the lender, all income from trust land in which I now have or may in the future acquire an interest, and any income from any

a petition in bankruptcy on June 8, 1971, listing the loan as a scheduled debt.[2] The Tribes admit receiving actual notice of the bankruptcy proceedings at some time prior to July 12, 1971.

Aubertin obtained a discharge in bankruptcy on March 9, 1972. However, under established procedures[3] followed by the Colville Indian Agency,[4] income from Aubertin's Indian Money Account was withheld from him and paid over to the Colville Tribes for application to his defaulted loan.

Aubertin brought this lawsuit seeking return of all sums withheld by the Colville Indian Agency since the filing of his petition in bankruptcy, and an injunction against further withholding.[5] The case is now here on cross-motions for summary judgment.

## I. JURISDICTION:

■ The principle is well-recognized that as dependent, quasi-sovereign nations, Indian tribes enjoy sovereign immunity and cannot be sued without the consent of Congress or the tribe. *United States v. United States Fidelity and Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *Lomayaktewa v. Hathaway*, 520 F.2d 1324 (9th Cir. 1975); *Twin Cities v. Minnesota Chippewa Tribe*, 370 F.2d 529 (8th Cir. 1967). Aubertin claims that the withholding by the Tribes of his per capita share of Indian money is contrary to provisions of the Indian Civil Rights Act, 25 U.S.C. § 1302.[6]

Although the Indian Civil Rights Act by its terms does not expressly limit tribal sovereign immunity, the courts have held that the Act does so by necessary implication.[7] As noted in *Martinez, supra*, at 1042,

---

source accruing to my Indian Money Account. I hereby grant the Commissioner full right, power, and authority to demand, collect, sue, or receipt for any income from my trust land and to apply such income or any of the funds in my Indian Money Account on my indebtedness to the lender. I hereby appoint the Commissioner as my attorney to execute such leases on any trust land in which I now have or may in the future acquire an interest, as the attorney may find necessary to facilitate repayment of this loan. I hereby give the attorney power to do everything necessary in the making of such leases as fully as I could do, and hereby ratify all that the attorney shall lawfully do or cause to be done under this authority. I understand and agree that in the case of my death, this assignment of income and power to lease shall constitute a claim against trust funds and income superior to that of my heirs.

2. Bankruptcy No. B–71N–297 (E.D.Wash.).

3. According to the affidavit of the superintendent of the Colville Indian Agency, all of the income from tribal lands is trust income collected by the United States for benefit of the Colville Confederated Tribes. The agency office determines which members are on a "withhold list." The aggregate of their per capita distributions is then credited to the agency "Individual Indian Money" account and the Tribes can transfer the credit to their own account. The Tribes have consistently withheld in this fashion the per capita payments of any member who has defaulted on his loan and applied the payments to the outstanding loan balance.

4. No federal official or entity was joined in this action. The Colville Indian Agency is the branch of the Bureau of Indian Affairs which carries out the trust responsibilities of the United States Government to the Colville Confederated Tribes.

5. The March 9, 1972 order of the Bankruptcy Court discharged Aubertin from all dischargeable debts without determining the dischargeability of any debt. See § 14, 11 U.S.C. § 32. Rule 409(a)(1) of the Bankruptcy Rules provides that a proceeding to determine the dischargeability of a debt may be instituted by a complaint "filed at any time," unless the restrictions of § 17 c(2) and Rule 409(a)(2) apply. This action is thus in the nature of adversary proceedings under Rule 701.

6. 25 U.S.C. § 1302. No Indian tribe in exercising powers of self-government shall— . . . (5) take any private property for a public use without just compensation; . . . (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law.

7. *Howlett v. Salish and Kootenai Tribes*, 529 F.2d 233 (9th Cir. 1976); *Johnson v. Lower Elwha Tribal Community*, 484 F.2d 200 (9th Cir. 1973); accord, *Thompson v. Tonasket*, 487 F.2d 316 (9th Cir. 1973); *Laramie v. Nicholson*, 487 F.2d 315 (9th Cir. 1973); *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 934 n. 9 (10th Cir. 1975); *Martinez v. Santa Clara Pueblo*, 540 F.2d 1039 (10th Cir. 1976).

"[S]ince this Act of Congress was designed to provide protection against tribal authority, the intention of Congress to allow suits against the tribe was an essential aspect. Otherwise, it would constitute a mere unenforceable declaration of principle." Moreover, 28 U.S.C. § 1343(4)[8] unequivocally confers on the district courts jurisdiction to determine whether an Indian tribe has denied any of the rights given to individuals under the Indian Civil Rights Act. *Howlett v. Salish and Kootenai Tribes, supra; Johnson v. Lower Elwha Tribal Community, supra; Crowe v. Eastern Bank of Cherokee Indians, Inc.,* 506 F.2d 1231 (4th Cir. 1974); *Luxon v. Rosebud Sioux Tribe of South Dakota,* 455 F.2d 698 (8th Cir. 1972).[9]

■ Therefore, the Tribes' initial contention that jurisdiction under the Indian Civil Rights Act should be limited to habeas corpus relief must be rejected.

Whether this is an appropriate case in which to assume jurisdiction turns on whether Aubertin's entitlement to "Indian money" is an interest protected under the Indian Civil Rights Act. Periodically, the Business Council of the Colville Tribes by resolution orders payment of a dividend to all tribal members. Each enrolled member of the Tribes is entitled to receive an equal share, with the exception of minors,[10] adults under a legal disability[11] and individuals who have defaulted on their loans.[12] The Tribes' policy of segregating from tribal funds the per capita share of those with delinquent debts and then crediting such share to each debtor's account is a recognition that each debtor would have been entitled to a dividend payment were he not indebted to the Tribes.

Although the resolution directing payment contemplates that the funds will be used for "subsistence, clothing, fuel, home repairs and improvements, furniture, educational expenses, medical and dental expenses, logging and farm equipment repairs and replacement, and other expenses", there is nothing to indicate that the Tribes may restrict how the funds are spent. Thus, when the dividend is disbursed, it becomes the exclusive possession of the individual recipient, free from tribal supervision.

■ Although Aubertin did not receive payment as a member of the Tribes, he had a vested interest in his share once it was segregated from tribal funds. I find that Aubertin's right to receive tribal dividends is protected by the due process clause of the Indian Civil Rights Act, and that he may properly bring his cause of action under the Indian Civil Rights Act.

Aubertin's claim under the Indian Civil Rights Act rests on his contention that the Tribes have failed to comply with the discharge given him in bankruptcy. The following issues are therefore raised: Does the Bankruptcy Act apply to Indian tribes, and if so, have the Tribes violated the Bankruptcy Act by withholding Aubertin's share of "Indian money"? Lastly, if the Tribes have violated the Bankruptcy Act, have they necessarily violated the Indian Civil Rights Act?

II. *THE APPLICABILITY OF THE BANKRUPTCY ACT TO INDIAN TRIBES:*

Article I, Section 8, Clause 4 of the Constitution vests in Congress the power to establish "uniform Laws on the subject of

---

**8.** 28 U.S.C. § 1343(4). The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

**9.** "The rationale behind these cases, with which we agree, is that the Indian Civil Rights Act creates a substantive body of rights, patterned in part on the Bill of Rights, to 'extricate the individual Indian' from decisions holding that a controversy between an Indian and his tribal government was an internal controversy." *Johnson v. Lower Elwha Tribal Community,* supra, at 203.

**10.** 25 CFR 104.4.

**11.** 25 CFR 104.5.

**12.** 25 CFR 104.9.

Bankruptcies throughout the United States." The purpose of the Bankruptcy Act has been described as "reliev[ing] the honest debtor from the weight of oppressive indebtedness and permit[ting] him to start afresh . . ." *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915), and granting "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

*Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) rejected any suggestion that deviations from the uniform application of the Bankruptcy Act can be allowed. While ruling that Arizona's anti-discharge provision in its Motor Vehicle Safety Responsibility Act was unconstitutional under the Supremacy Clause because it conflicted with the federal Bankruptcy Act, the Supreme Court held in effect that a comparable law for the District of Columbia, enacted by Congress, was also unconstitutional because the Bankruptcy Clause in the Constitution requires uniformity throughout the nation.[13]

Although *Perez* did not deal specifically with a discharge against an Indian tribe, it went so far as to strike down even an act of Congress carving out an exception to the coverage of the Bankruptcy Act for one group and not others. Consequently, its broad language must be read to mean that an amendment to the Bankruptcy Act itself

is necessary before an exception for Indian tribes is available.

The Supreme Court has also held that, "a general statute in terms applying to all persons includes Indians and their property interests," and that an exclusion for Indians must rest on plain words. *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99 at 116, 80 S.Ct. 543 at 553, 4 L.Ed.2d 584 (1960). Applying the above standard, this circuit has ruled that federal firearm statutes apply to Indians absent a treaty right exempting the tribe from operation of the particular statute. *United States v. Burns*, 529 F.2d 114 (9th Cir. 1975). In two cases involving the tax status of individual Indians, *Choteau v. Burnet*, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931) and *Leahy v. State Treasurer*, 297 U.S. 420, 56 S.Ct. 507, 80 L.Ed. 771 (1936), the Supreme Court held that absent a definitely expressed exemption, federal statutory language which subjects the income of "every individual" to taxation applies to an Indian's pro rata share of tribal royalty income derived from restricted mineral resources.

The Tribes claim that the federal doctrine of Indian sovereignty, as reflected in the statutes, treaties, regulations and orders, is of long standing duration. Therefore, any congressional intention to circumscribe Indian sovereignty should not be read lightly into possibly conflicting congressional enactments. Specifically, the Tribes argue that disallowing the post-bankruptcy withholding would encroach upon tribal sover-

---

13. "In light of our decision today, the sum of the argument is to draw into question the constitutional validity of the District's anti-discharge section, for as noted in the dissent the Constitution confers upon Congress the power '[t]o establish * * * *uniform* Laws on the subject of Bankruptcies throughout the United States.' U.S. Const., Art. I, § 8, cl. 4 (emphasis added). . . .

"Had Congress focused on the interaction between this minor subsection of the rather lengthy financial responsibility act and the discharge provision of the Bankruptcy Act, it would have been immediately apparent to the legislators that the only constitutional method for so defining the scope and effect of a discharge in bankruptcy was by amendment of the Bankruptcy Act, which by its terms is a uniform statute applicable in the States, Territories, and the District of Columbia. 11 U.S.C. § 1(29). To follow any other course would obviously be to legislate in such a way that a discharge in bankruptcy means one thing in the District of Columbia and something else in the States—depending on state law—a result explicitly prohibited by the uniformity requirement in the constitutional authorization to Congress to enact bankruptcy legislation." 402 U.S. at 654, 656, 91 S.Ct. at 1714.

eignty in two respects: First, it would defeat a major tribal governmental function, namely, the ability to use tribal assets to help members in need of loans. Second, it would somehow contribute to the undermining of the Tribes's cultural identity. Defendant alludes to "basic Indian cultural values and beliefs . . ., customs and practices . . ., notions of fairness commonly held in the Colville Tribal Community, . . ., the principle that an Indian should not break his promise to . . . or take advantage of, his tribe, [which would be] offended by the idea that a tribal member can take advantage of bankruptcy to avoid repayment of his tribal obligation, and then demand that the tribe continue to pay him his share of tribal income . . ."

■ I find that allowing a bankruptcy discharge to operate against the Tribes in this case will not undermine tribal institutions. Defendant is engaged in the business of lending money, following loan practices similar to those of any non-Indian lender operating in the commercial money market. Its claims that its loan program would be hurt if a discharge in bankruptcy is effective against it may be true. But it does not necessarily follow that its business activities should therefore constitute internal tribal affairs free from the reach of applicable federal laws. The Tribes' loan transactions are commercial activities properly subject to the Bankruptcy Act. Section 17c(3) of the Bankruptcy Act, 11 U.S.C. § 35(c)(3), provides that the bankruptcy court shall determine the dischargeability of any debt not excepted under Section 17 a. For the reasons stated above, I conclude

that the Bankruptcy Act is an implied waiver of tribal immunity and that the bankruptcy court has the authority to discharge plaintiff's debt to the Colville Confederated Tribes.

### III. THE EFFECT OF THE DISCHARGE:

I now turn to the issue of whether the Tribes' withholding of surplus funds, despite Aubertin's discharge in bankruptcy, violated the Bankruptcy Act. Aubertin contends that the Tribes' withholding of funds is prohibited by the 1970 Amendment to Section 14 of the Bankruptcy Act, 11 U.S.C. § 32.[14] Specifically, he argues that the prohibition against "employing any process" to collect discharged debts in f(2) of the Amendment includes the actions of the Tribes. Further, to allow the Tribes to use "the Bureau of Indian Affairs as a collection agency for discharged debts of tribal members" would be contrary to the whole purpose of the Bankruptcy Act, that is, to grant the honest debtor a fresh start.

■ Aubertin's interpretation of the 1970 Amendment is not supported by legislative history. The purpose of the Amendment was "to effectuate more fully the discharge in bankruptcy by rendering it less subject to abuse by harassing creditors." S.Rep. No. 91–1673, 91st Cong., 2d Session (1970). But the legislative record leaves no doubt that only a specific type of abuse was of concern: that creditors could bring suit in a state court after a discharge had been granted, often obtaining a default judgment against the debtor who either relied

---

**14.** f. An order of discharge shall—

(1) declare that any judgment theretofore or thereafter obtained in any other court is null and void as a determination of the personal liability of the bankrupt with respect to any of the following: (a) debts not excepted from the discharge under subdivision a of section 17 of this Act; (b) debts discharged under paragraph (2) of subdivision c of sec-

tion 12 of this Act; and (c) debts determined to be discharged under paragraph (3) of subdivision c of section 17 of this Act; and

(2) enjoin all creditors whose debts are discharged from thereafter instituting or continuing any action or employing any process to collect such debts as personal liabilities of the bankrupt.

on his discharge or did not have the resources to contest the action.[15] Thus, the words "employing any process" prohibits only the use of legal process to induce the debtor to repay his discharged debt. It does not preclude non-legal, informal means of inducing the debtor to make payment of the obligation. *Girardier v. Webster College*, 563 F.2d 1267 (8th Cir. 1977).

 I conclude that even should the loan agreement fail to establish a security interest surviving discharge—a question which need not be decided here—the Colville Confederated Tribes are not required to account to Aubertin for the money collected in repayment of his obligation. The discharge in bankruptcy only goes as far as to preclude the Tribes from enforcing the agreement through legal process in the courts.

For the reasons stated, summary judgment is given for the Colville Confederated Tribes.

---

15. In explaining the purpose of Section f., the Chairman of the Committee on Legislation of the National Bankruptcy Conference wrote:

To effectuate the discharge, and render it unnecessary for the bankrupt to raise it as an affirmative defense in a later state court action in the multitude of cases where abuses have become apparent, the order granting discharge will contain two directives: any judgment previously or subsequently obtained in another court is null and void as a determination of personal liability . . . [C]reditors whose debts are so discharged shall be enjoined from commencing or continuing actions on such debts as personal liabilities of the bankrupt . . . Thus, creditors, in particular, are informed expressly that if their claims are discharged they may not thereafter seek to obtain personal liability upon them in another court, and, in fact, are enjoined from doing so. Thus, harassment lawsuits should be eliminated and the bankrupt freed of the necessity to retain legal assistance in another court to assert his discharge and to be unburdened from the effects of judgments which today are not rightfully obtained . . .

Hearings before Subcommittee No. 4 of the Committee on the Judiciary, House of Representatives, 91st Cong., 1st Session (1969) on S.J. Res. 88, H.R. 6665 and H.R. 1250, p. 98.