The CHEMEHUEVI INDIAN TRIBE, Plaintiff,

v.

CALIFORNIA STATE BOARD OF EQUALIZATION: George M. Reilly; Iris Sankey; William M. Bennett; Richard Nevins; and Kenneth Cory, Individually and in their official capacities as members of the California State Board of Equalization; Bank of America N. T. & S. A., a national banking association; and David Cordier, Individually and in his official capacity as employee of the California State Board of Equalization, Defendants.

No. C–77–2838 RFP.

United States District Court,
N. D. California.

Dec. 12, 1979.

---

Stephen V. Quesenberry, Lester J. Marston, George Forman, California Indian Legal Services, Escondido, Cal., for plaintiff.

George Deukmejian, Atty. Gen. of Cal., Gary L. Larson, Deputy Atty. Gen., San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### BACKGROUND

The Chemehuevi Indian Tribe ("Tribe") commenced this action by filing a complaint for declaratory and injunctive relief on December 15, 1977. The California State Board of Equalization ("Board") had previously determined that the Tribe owed the state amounts totaling $11,702.95 for taxes that it allegedly should have collected from non-Indian purchasers of cigarettes on the reservation, including interest and penalties on the taxes owed. The Board then issued

a "withhold notice" asking that the Bank of America withhold from the Tribe's funds twice the amount of the claimed delinquency. It also recorded liens against all tribal property and assets located in San Bernardino and Los Angeles Counties, including property held in trust for the Tribe by the United States, and had a warrant issued to the Sheriff of Los Angeles County directing him to seize and sell such tribal assets as may be necessary to satisfy the claimed liens. After the Tribe filed its complaint, the Board filed a counterclaim for the amount of taxes allegedly owing from the Tribe.

The court granted a preliminary injunction on January 19, 1978 prohibiting the Board from collecting any taxes, past or future, from the Tribe and ordering the Tribe to pay into an escrow account the approximate tax that would be collected from non-Indians if the California Cigarette Tax Law were to be applied. Following a trial on stipulated facts, the court vacated the submission by order dated July 9, 1979 to await the Supreme Court's decision in *Confederated Tribes of Colville v. Washington.* The court simultaneously modified the preliminary injunction to relieve the Tribe of the obligation to make further deposits into the escrow account pending the outcome of this litigation. At that time the Tribe had deposited $19,174.17 into the escrow account.

On October 5, 1979, the Tribe filed a motion to reconsider and amend the court's order of July 9, asking either that judgment be entered in favor of the Tribe on the ground that it is not a "person" within the meaning of the California Cigarette Tax Law and that the law is therefore inapplicable to its cigarette sales, or, in the alternative, that the Board's counterclaim be dismissed and the funds in the escrow account be released to the Tribe on the ground that the Tribe, as a sovereign, is immune from unconsented suit. This motion was submitted to the court after oral argument on November 5, 1979.

In support of the first ground for reconsideration, the Tribe cited the recent Supreme Court case of *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979). In that case the Court construed the meaning of the term "white person" as used in a federal statute placing the burden of proof on the white person in all trials about the right of property in which an Indian is a party on one side and a white person on the other. Although the Court observed that as a matter of common usage the term "person" does not include sovereigns, and that such a construction should particularly be disfavored where the statute imposes a burden on those classified as persons, the opinion makes clear that the proper interpretation is ultimately a question of legislative intent. The Supreme Court's interpretation of the term "person" in the federal statute before it in *Wilson* is thus clearly not dispositive in divining the intent of the California legislature in enacting its cigarette tax law.

The Tribe cites the recent decision of the Ninth Circuit in *People v. Quechan Tribe of Indians,* 595 F.2d 1153 (1979) in support of its second ground for reconsideration. In that case the State of California as plaintiff sought declaratory relief against an Indian tribe. The Ninth Circuit held that the tribe enjoyed sovereign immunity from unconsented suit absent a waiver of that immunity by Congress, noting that the courts have no choice but to recognize sovereign immunity. Plaintiff argues that since it would be immune from suit in a declaratory judgment action, then a fortiori it is immune from this counterclaim seeking money damages, since one of the underlying rationales for tribal sovereign immunity is to protect tribal monetary resources from depletion.

The Tribe's claim of sovereign immunity has considerable merit. The state's counterclaim must therefore be dismissed, and the court's order of July 9 modified to release to the Tribe the funds held in the escrow account.[1]

1. Since the Tribe has dropped its claim for monetary damages against the Board and now seeks only declaratory and injunctive relief and nominal damages, the recoupment exception to the doctrine of sovereign immunity does not apply. *See Bull v. United States,* 295 U.S. 247,

## ANALYSIS

The sovereign status of the Tribe has ramifications that potentially reach almost every issue presented in this lawsuit. The decision of the Supreme Court in the *Colville* case might make it unnecessary for this court to decide whether the state is precluded on grounds of intergovernmental immunity or tribal preemption from taxing the Tribe's sales of cigarettes on the reservation. However, the Supreme Court is not presented with the procedural issues of sovereign immunity that the Tribe raises in this motion since the retailers in *Colville* are individual Indians licensed as dealers by the tribes rather than the tribes themselves. The *Colville* decision is therefore unlikely to shed any light on these issues.

The sovereign immunity of the Tribe has two procedural aspects that require dismissal of the counterclaim and modification of the court's order. First, it limits the court's jurisdiction over the counterclaim. Second, it limits the remedy the court might award even if it should hold in favor of the state in the Tribe's declaratory judgment action. Although as a practical matter these two limitations are obviously interdependent, for analytical purposes it is useful to consider them separately.

### I. *Sovereign Immunity From Suit*

 It has long been recognized that Indian tribes enjoy sovereign immunity

from unconsented suit,[2] subject to the plenary control of Congress. *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). An Indian tribe does not consent to suit on a counterclaim merely by filing an action as a plaintiff. *United States v. United States Fidelity & Guaranty Co., supra.* The Board does not allege that the Tribe has consented to be sued, but rather argues that rule 13(a) of the Federal Rules of Civil Procedure[3] constitutes a congressional waiver of tribal sovereign immunity for compulsory counterclaims. This argument has no merit.

 The standard articulated by the Supreme Court for finding a Congressional waiver of tribal sovereign immunity is that there be an "unequivocal expression of . . . legislative intent." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). Statutory exceptions to tribal sovereign immunity will not be implied, and express exceptions will be strictly construed. Thus in *Santa Clara Pueblo v. Martinez, supra,* the Supreme Court found that the Indian Civil Rights Act, which provides in part that "[n]o Indian tribe in exercising powers of self-government shall . . . deny to any person within its jurisdiction the equal protection of its laws," 25 U.S.C. § 1302(8), does not

---

55 S.Ct. 695, 79 L.Ed. 1421 (1935); *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1939); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 511, 60 S.Ct. 653, 655, 84 L.Ed. 894 (1940); *United States v. Agnew*, 423 F.2d 513 (9th Cir. 1970). In any event, the recoupment exception cannot justify maintaining funds in the escrow account since by definition it is limited to reducing the amount of any award in favor of the sovereign:

> Although a counterclaim may be asserted against a sovereign by way of set off or recoupment to defeat or diminish the sovereign's recovery, no affirmative relief may be given against a sovereign in the absence of consent.

*United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970).

2. Although Justice Blackmun has suggested that the doctrine of tribal sovereign immunity

"may well merit re-examination in an appropriate case," *Puyallup Tribe of Indians v. Department of Game*, 433 U.S. 165, 179, 97 S.Ct. 2616, 2624, 53 L.Ed.2d 667 (1977) (concurring opinion), the Supreme Court has more recently unanimously reaffirmed the doctrine in a decision in which Justice Blackmun did not participate. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

3. Rule 13(a) reads in part as follows:

> (a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

authorize the bringing of civil actions for declaratory or injunctive relief against an Indian tribe to enforce its substantive provisions. The only express remedial provision of the Act made "[t]he privilege of the writ of habeas corpus . . . available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303. The Court observed that "since the respondent in a habeas corpus action is the individual custodian of the prisoner, [citations omitted], the provisions of section 1303 can hardly be read as a general waiver of the tribe's sovereign immunity." 436 U.S. at 59, 98 S.Ct. at 1677. Subsequent decisions of the Ninth Circuit have shown a similar reluctance to find a Congressional waiver of tribal sovereign immunity absent express language. *See, e. g., California v. Quechan Tribe of Indians,* 595 F.2d 1153 (9th Cir. 1979) (statute authorizing declaratory relief not a waiver of sovereign immunity by Congress); *Sekaquaptewa v. Mac-Donald,* 591 F.2d 1289 (9th Cir. 1979) (statute authorizing lawsuit between Hopi and Navajo tribes to settle dispute over lands did not lift bar of sovereign immunity to allow individuals whose rights would be adjudicated in the lawsuit to intervene).

Judged by this standard, rule 13(a) cannot be construed as a Congressional waiver of tribal sovereign immunity for compulsory counterclaims. First, the statutory authority under which the Supreme Court may prescribe the Federal Rules of Civil Procedure expressly states that "[s]uch rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C.A. § 2072 (West Supp.1979). Thus a waiver of tribal sovereign immunity would be beyond the scope of the statutory authority for promulgating the Federal Rules.

Second, even if it were possible to effectuate a Congressional waiver of sovereign immunity via the Federal Rules of Civil Procedure, rule 13 cannot be construed to do so. The rule makes no mention of tribal sovereign immunity, but rule 13(d) expressly disclaims any intention to limit *federal* sovereign immunity:

These rules shall not be construed to enlarge beyond the limits now fixed by law

the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof.

The Supreme Court requires that any waiver of sovereign immunity be express and unequivocal, *Santa Clara Pueblo, supra* ; the text of rule 13 fails to satisfy this requirement.

■ Finally, the provisions of rule 13 are subject to the limitations of rule 82. *See* Advisory Committee note 5 to rule 13. Rule 82 states in part:

These rules shall not be construed to extend or limit the jurisdiction of the United States district courts . . . ..

The advisory committee notes to rule 82 further clarify the significance of the rule for jurisdiction over counterclaims:

These rules grant extensive power of joining claims and counterclaims in one action, but, as this rule states, such grant *does not extend federal jurisdiction.* [Emphasis added.]

The doctrine of tribal sovereign immunity limits the jurisdiction of the courts over claims against Indian tribes. *See, e. g., Puyallup Tribe v. Department of Game,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) ("Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe." *Id.* at 172, 97 S.Ct. at 2621); *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) ("Consent alone gives jurisdiction to adjudge against the sovereign. Absent that consent, the attempted exercise of judicial power is void. . . ." *Id.* at 514, 60 S.Ct. at 657); *California v. Quechan Tribe of Indians,* 595 F.2d 1153 (9th Cir. 1979) ("Sovereign immunity involves a right which courts have no choice, in the absence of a waiver, but to recognize." Id. at 1155). Rule 82 makes clear that such a jurisdictional limitation may not be lifted by the Federal Rules of Civil Procedure.

II. *Sovereign Immunity as a Limitation on Relief*

■ The Tribe's sovereign immunity does not deprive this court of jurisdiction to de-

cide the substantive issues presented in the Tribe's claim for declaratory and injunctive relief. Even if the court should hold in favor of the Board of Equalization, however, it could not award any relief to the state against the Tribe.

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114, cited by the Board in its opening trial brief, does not indicate a contrary result. In *Mescalero*, the Supreme Court held that the State of Arizona could impose a gross receipts tax on the operation of a ski resort by an Indian tribe off the reservation. The Board invites this court to infer that "the Court must not have seen the Tribe's sovereign immunity from unconsented suit as a bar to the imposition of state liability on the Tribe where the Tribe, through its commercial activities, had brought itself within the jurisdictional pale of the state." Defendant's Opening Trial Brief at 11. The flaw in this argument is that sovereign immunity from suit was not an issue in *Mescalero*; the tribe had paid the gross receipts tax under protest and was seeking a refund. 411 U.S. at 146–47, 93 S.Ct. at 1269–70. The question of whether the state could enforce its gross receipts tax by suing the tribe was not presented to the Court. It therefore had only to decide whether this off-reservation tribal enterprise enjoyed immunity as a substantive matter from state taxation. No affirmative relief was awarded against the tribe.

The more recent decision of the Supreme Court in *Puyallup Tribe v. Department of Game*, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), clarifies the distinction between jurisdiction to determine the validity of state regulation of Indian activities and jurisdiction to give relief against an Indian tribe. In that case the Department of Game of the State of Washington challenged the extensive fishing of steelhead trout in the Puyallup River by members of the Puyallup tribe as violative of the state's conservation laws. The trial court entered a judgment limiting the number of steelhead trout that members of the tribe could

catch, and directing the tribe itself to file a list of members authorized to exercise tribal fishing rights and to report the number of steelhead caught by tribal members each week. On certiorari, the Supreme Court vacated and remanded. Although it upheld the jurisdiction of the state trial court to enjoin individual tribal members from violating state law, it held that "the portions of the state-court order that involve relief against the Tribe itself must be vacated in order to honor the Tribe's valid claim of immunity." 433 U.S. at 173, 97 S.Ct. at 2621.

In reaching its decision, the Court acknowledged the practical problem presented by limiting the number of fish that all tribal members could catch while simultaneously refusing to require that the tribe provide the information necessary for the state to enforce the limitation. The Court observed that

> although it properly resists the authority of the state court to order it to provide information with respect to the status of enrolled members of the Tribe and the size of their catch, it may find that its members' interests are best served by voluntarily providing such information to respondent and to the court in order to minimize the risk of an erroneous enforcement effort.

*Id.* at 178, 97 S.Ct. at 2624. Thus it is evident that in the Court's view practical problems of enforcing state law without the cooperation of the tribe neither defeated the tribe's claim of sovereign immunity nor deprived the court of jurisdiction to determine the substantive issue of the authority of the state to apply its conservation laws to fishing by individual Indians.

 Similarly, in this case even if the court were to decide in favor of the Board in the declaratory judgment action brought by the Tribe, it would still not have jurisdiction to adjudicate a counterclaim against the Tribe, nor to award money damages or injunctive relief against the Tribe.

The Tribe's sovereign immunity might create practical difficulties for the Board in attempting to enforce its cigarette tax laws against the Tribe, but these potential enforcement problems cannot override the Tribe's claim of sovereign immunity. Since this court would not have jurisdiction to award the funds in the escrow account to the Board, the funds must be released to the Tribe.

## CONCLUSION

The Tribe's claim of sovereign immunity is well-founded and requires that the counterclaim of the defendant Board of Equalization be dismissed and the funds currently held in the escrow account be released to the Tribe. The court's order of July 9, 1979 and the preliminary injunction should be modified accordingly.

IT IS SO ORDERED.