657 F.2d 1009
 UNITED STATES of America, Plaintiff,
and
The Confederated Tribes and Bands of the Warm Springs
Reservation of Oregon; Confederated Tribes of the
Umatilla Indian Reservation; and Nez
Perce Tribe of Idaho, Intervenors,
Confederated Tribes and Bands of the Yakima Indian Nation, Appellant,
v.
STATE OF OREGON, Defendant,
and
State of Washington, Appellee.
 No. 80-3218.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 6, 1981.
Decided Sept. 10, 1981.
As Amended Jan. 18, 1982.
 
 James B. Hovis, Hovis, Cockrill & Roy, Yakima, Wash., for appellant.
 James M. Johnson, Olympia, Wash., George Dysart, Portland, Or., Maria A. Iizuk, Washington, D. C., for appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before KENNEDY and ALARCON, Circuit Judges, and HENDERSON,* District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 The primary issue in this appeal is whether the district court had jurisdiction to enjoin the Confederated Tribes and Bands of the Yakima Indian Nation (Yakima Tribe) in an ongoing fishing dispute. The present dispute centers around the annual spring run of Columbia River chinook salmon. In recent years, that run has severely declined. In an attempt to preserve the species, the United States District Court for the District of Oregon enjoined virtually all Yakima tribal fishing of the spring chinook. The Tribe argues that this injunction extinguished its treaty fishing rights while failing to protect the spring run. We disagree and affirm.
 
 I. Factual Background
 
 2
 The United States initiated this action in 1968 seeking to establish and protect the treaty fishing rights of all Indian tribes occupying the Columbia River basin. The Yakima Tribe intervened as a party plaintiff soon thereafter. In 1969, the court below entered judgment for the plaintiffs in an opinion reported as Sohappy v. Smith, 302 F.Supp. 899 (D.Or.1969).[1] That judgment enjoined Oregon, then the only defendant, from enforcing specified fishing regulations. More importantly, it also established a procedure for promulgating future state regulations, and expressly retained continuing jurisdiction in order to expedite enforcement of its decree.
 
 
 3
 The State of Washington, appellee here, was not an original party. It intervened as of right in 1974, after agreeing to be bound fully by the original decree. Since then, both Washington and the Yakima Tribe have applied successfully to the district court for modifications of the original decree.[2]
 
 
 4
 In 1977, the original parties and the intervenors signed a conservation agreement regarding all anadromous fish spawning above Bonneville Dam.[3] This agreement was designed to be a negotiated alternative to the federal suit. It set escapement goals[4] for each species, including the spring chinook, and provided for the establishment of future management techniques. During the plan's five year life, the parties agreed to tender to the Oregon district court any dispute incapable of a negotiated resolution.
 
 
 5
 The events leading to this appeal began on April 30, 1980, when Washington applied to the Oregon district court for an injunction against any Yakima tribal fishing of spring chinook.[5] Washington asserted that such a drastic measure was necessary because precariously low numbers of that salmon were passing Bonneville Dam. These low numbers, in turn, indicated that the safe passage of every salmon was necessary to preserve the species.
 
 
 6
 Several traditional Yakima fisheries were affected by the proposed decree. All of the affected fisheries, however, were located in Washington on either the Yakima or the Klitckitat rivers; these rivers feed directly into the Columbia. At least two affected fisheries were located directly on the Yakima tribal reservation.
 
 
 7
 The district court expedited matters, and on May 5, 1980, after hearing testimony from both sides, it ordered a virtual ban on Yakima fishing.[6] The court found that "(t)he 1980 run of spring chinook into the Yakima River is so depressed that all such salmon are necessary for spawning escapement" and that "unless an injunction is issued, immediate and irreparable harm will be suffered to the Klitckitat and Yakima spring chinook runs ...."
 
 
 8
 The Tribe has appealed the grant of the preliminary injunction.[7] 28 U.S.C. § 1292(a)(1) (1976). A preliminary injunction, however, "will normally be reversed only if the lower court abused its discretion or based its decision upon erroneous legal premises." Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1200 (9th Cir. 1980). See also Wright v. Rushen, 642 F.2d 1129, 1132 (9th Cir. 1981); Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 314 (9th Cir. 1978), cert. dismissed, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). In order to meet this standard, the Tribe contends that: the Tribe is immune from suit; the court below lacked subject matter jurisdiction; the injunction unduly interfered with the Tribe's treaty rights; and the relief granted was inconsistent with the 1969 decree. Since many of the issues presented by these claims may be resolved by examining the tribal immunity issue, we address it first.
 
 II. Sovereign Immunity
 
 9
 As a general proposition, Indian tribes are immune from suit in state or federal court.[8] Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978); Puyallup Tribe, Inc. v. Department of Game of Washington, 433 U.S. 165, 171-73, 97 S.Ct. 2616, 2620-2621, 53 L.Ed.2d 667 (1977) (Puyallup III ); California ex rel. Cal. Dep't of Fish and Game v. Quechan Tribe of Indians, 595 F.2d 1153, 1155 (9th Cir. 1979). Indian tribes enjoy immunity because they are sovereigns pre-dating the constitution, and immunity is thought necessary to preserve autonomous tribal existence. United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512-13, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); Turner v. United States, 248 U.S. 354, 357-58, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919).[9] The immunity, however, is not absolute. Like other sovereign powers possessed by Indian tribes, it exists only at the sufferance of Congress and is subject to complete defeasance. United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978); see also Montana v. United States, 450 U.S. 544, 560-563, 101 S.Ct. 1245, 1256-1257, 67 L.Ed.2d 493 (1981); Bottomly v. Passamaquoddy Tribe, 599 F.2d 1061, 1066 (1st Cir. 1979). Consequently, all parties agree that tribal immunity may be pierced by congressional act. Martinez, 436 U.S. at 58, 98 S.Ct. at 1676; Hamilton v. Nakai, 453 F.2d 152, 158-59 (9th Cir.), cert. denied, 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972).
 
 
 10
 The Tribe, however, asserts that Congress alone has the power to overcome tribal immunity. It argues that since no act of Congress has expressly waived Yakima immunity, or granted Indian tribes the power to waive immunity generally, the Yakima Tribe may not be sued. We believe this view is contrary to both precedent and policy.
 
 
 11
 Some courts have expressed doubts on the ability of Indian tribes to waive immunity,[10] but the Supreme Court has expressed clearly its position. In Turner v. United States, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919), Mr. Justice Brandeis found tribal immunity, stating that "(w)ithout authorization from Congress, the (tribe) could not ... have been sued in any court; at least (not) without its consent." Id. at 358, 39 S.Ct. at 110. The Court carried this idea forward in Puyallup III. In finding immunity, the Court relied on the fact that the non-Indian party did not prove "that either the Tribe or Congress ha(d) waived its claim of immunity or consented to the entry of an order against it." 433 U.S. at 173, 97 S.Ct. at 2621. See also id. at 171, 172, 97 S.Ct. at 2620, 2621; Puyallup Tribe v. Department of Game of Wash., 391 U.S. 392, 396-97 n.11, 88 S.Ct. 1725, 1727-1728, 20 L.Ed.2d 689 (1968) (Puyallup I ). If Indian tribes could not waive immunity, the italicized language above would be surplusage. We think it is more than that.
 
 
 12
 We thus hold that Indian tribes may consent to suit without explicit Congressional authority. At least three other circuits have so held. See Merrion v. Jicarilla Apache Tribe, 617 F.2d 537, 540 (10th Cir. 1980) (en banc), cert. granted on other issues, 449 U.S. 820, 101 S.Ct. 71, 66 L.Ed.2d 21 (1980), restored to calendar, --- U.S. ----, 101 S.Ct. 3156, 69 L.Ed.2d 1003 (1981); Fontenelle v. Omaha Tribe of Neb., 430 F.2d 143, 147 (8th Cir. 1970); Maryland Cas. Co. v. Citizens Nat'l Bank of W. Hollywood, 361 F.2d 517, 520-21 (5th Cir.), cert. denied, 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966).[11]
 
 
 13
 Clear policy considerations also militate in favor of the tribe's power to consent to suit. As the Yakima Tribe itself argues, its treaty with the government secures to it certain powers of self-determination. To hold that the ability to waive immunity is not among those powers would be contrary to that right. See Bottomly, 599 F.2d at 1066.[12] Further, non-Indian interests might prudently avoid contracts with Tribes that would otherwise prove beneficial to the Indians, with the result that Tribes wishing to engage in business would be needlessly impeded. See, e. g., Parker Drilling Co. v. Metlakatla Indian Community, 451 F.Supp. 1127, 1136 (D.Alas.1978). Accordingly, since tribes may consent to suit, the issue here is whether the Yakima Tribe has manifested its consent to this suit.
 
 
 14
 The parties have advanced two theories of consent. Under the first, it is asserted that the Tribe's intervention constitutes consent. The second posits that the Tribe consented by agreeing in 1977 to submit all disputes over fishing to the Oregon district court. Both theories are sound.
 
 
 15
 Intervenors under Fed.R.Civ.P. 24(a)(2), such as the Yakima Tribe, enter the suit with the status of original parties and are fully bound by all future court orders. Marcaida v. Rascoe, 569 F.2d 828, 831 (5th Cir. 1978); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1920 (1972); 3B Moore's Federal Practice P 24.16(6), at 24-671 to 24-673 (2d ed. 1981). By successfully intervening, a party "makes himself vulnerable to complete adjudication by the federal court of the issues in litigation between the intervener and the adverse party." Id. at 24-671.
 
 
 16
 Here, the Tribe intervened to establish and protect its treaty fishing rights; a basic assumption of that action was that there would be fish to protect. Had the original decree found the species to be in jeopardy, and enjoined all parties from future fishing in order to conserve the species, the Yakimas could not have then claimed immunity from such an action.[13] Otherwise, tribal immunity might be transformed into a rule that tribes may never lose a lawsuit.
 
 
 17
 The only difference here is the court retained post-judgment jurisdiction to modify its decree. Retention of jurisdiction is characteristic of equitable decrees. See Developments in the Law Injunctions, 78 Harv.L.Rev. 994, 1081-84 (1965). As Mr. Justice Frankfurter stated, an equitable injunction is " 'permanent' only for the temporary period for which it may last." Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U.S. 287, 298, 61 S.Ct. 552, 557, 85 L.Ed. 836 (1941). To hold at this stage that tribal immunity blocks modification of an equitable decree would impermissibly violate a central tenet of equity jurisprudence, that of flexible decrees. By seeking equity, this Tribe assumed the risk that any equitable judgment secured could be modified if warranted by changed circumstances. By intervening, the Tribe assumed the risk that its position would not be accepted, and that the Tribe itself would be bound by an order it deemed adverse.
 
 
 18
 The Tribe argues, however, that United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (USF&G ) supports their position.[14] In USF&G, the Court held that tribal immunity barred a compulsory counterclaim in excess of the original claim. See also Chemehuevi Indian Tribe v. California State Bd. of Equalization, 492 F.Supp. 55, 57-59 (N.D.Cal.1979).[15] The tribe analogizes the present injunction to the counterclaim in USF&G ; it claims that, by entering the suit, it was entitled either to an injunction in its favor or no relief at all. It argues that an injunction against the tribe was not among the possibilities initially risked and hence this later injunction was more like the barred counterclaim in USF&G.
 
 
 19
 We think this misconceives the basic nature of the underlying action. The original action, by seeking a declaration of treaty fishing rights, sought to apportion the Columbia River anadromous fishery among competing sovereigns. It thus has been recognized as analogous to an equitable action in rem. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 690 n.32, 99 S.Ct. 3055, 3078, 61 L.Ed.2d 823 (1979); United States v. Washington, 520 F.2d 676, 687 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); United States v. Crookshanks, 441 F.Supp. 268, 270 (D.Or.1977) (contempt proceeding for violation of decree at issue here). In such an action, "a court possessed of the res in a proceeding in rem, such as one to apportion a fishery, may enjoin those who would interfere with that custody." Washington v. Washington Commercial and Passenger Fishing Vessel Ass'n, 443 U.S. 658, 692 n.32, 99 S.Ct. 3055, 3078, 61 L.Ed.2d 823 (1979).[16] Here, Washington alleged that the very resource sought to be protected, the anadromous fishery, was in jeopardy. Since the existence of the salmon was inextricably linked to the res in the court's constructive custody, the court was empowered to enjoin interference with that custody.
 
 
 20
 The Tribe, moreover, has expressly consented to this suit. In paragraph seven of the 1977 agreement, the Tribe agreed "(i)n the event that significant management problems arise from this agreement that cannot be resolved by mutual agreement, the parties agree to submit the issues to federal court for determination. In any event, the Court shall retain jurisdiction over the case of U. S. v. Oregon, Civil 68-513, (D.C.Or.)."
 
 
 21
 Here Washington and the tribe have a definite dispute over the management of anadromous fisheries; Washington believes that complete cessation of fishing is necessary to preserve the spring chinook and the tribe believes the opposite. This is exactly the type of dispute envisioned in 1977 when the Yakimas agreed to submit any dispute to the Oregon district court. Consequently, the Tribe may not at this stage renege on its earlier agreement. Cf. Fontenelle, 430 F.2d at 147 (inclusion of general "sue or be sued" clause in tribal constitution "rendered (tribe) amenable to a quiet title action.")
 
 III. Other Contentions
 
 22
 The Yakimas also contend that the court below lacked jurisdiction, that the injunction is a judicial abrogation of treaty rights, and that the relief granted was inconsistent with standards set forth in the 1969 decree. We deal with these contentions in order.
 
 
 23
 The Tribe claims a lack of subject matter jurisdiction because the Oregon district court enjoined acts occurring in the State of Washington. Whatever analytic merit the argument may have, and we are dubious since the parties were before the court and subject to its jurisdiction,[17] the question has already been litigated adversely to the Tribe. In Puget Sound Gillnetters Ass'n v. United States District Court, 573 F.2d 1123, 1133 (9th Cir. 1978), vacated on other grounds, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), an earlier appeal in this case, we upheld jurisdiction, stating: "(t)he district court's jurisdiction extends to the entire Columbia River, not simply to the Oregon side." See also Oregon Admissions Act of February 14, 1859, §§ 1, 2, 11 Stat. 383; United States v. Crookshanks, 441 F.Supp. 268 (D.Or.1977); The Annie M. Smull, 1 Fed.Cas. 983 (D.Or.1872) (No. 423).
 
 
 24
 The Yakimas also contend that the treaty secures to them the right to fish on their reservation without interference. From this, they argue that any injunction that restricts on-reservation fishing improperly abrogates their treaty fishing rights. This claim is false. It is established that "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the state in the interest of conservation ...." Puyallup I, 391 U.S. at 398, 88 S.Ct. at 1728. This rationale has been extended to on-reservation fishing. Puyallup III, 433 U.S. at 173-177, 97 S.Ct. at 2621-2623; see also Kimball v. Callahan, 590 F.2d 768, 776-77 (9th Cir. 1979), cert. denied, 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1980). See Comment, State Power and the Indian Treaty Right to Fish, 59 Calif.L.Rev. 485, 508-09 (1971). If states can regulate treaty fishing in the interest of conservation, then, a fortiori, a federal court with jurisdiction over all parties[18] may do the same. As noted by the Supreme Court, "the Treaty does not give the Indians a federal right to pursue the last living (salmon) until it enters their nets." Department of Game of Washington v. Puyallup Tribe, 414 U.S. 44, 49, 94 S.Ct. 330, 333, 38 L.Ed.2d 254 (1973).
 
 
 25
 Finally, the Tribe argues that Washington's factual showing for the injunction was inadequate when judged against standards set forth in the 1969 decree. These standards, they claim, require that any modification sought be, with respect to Indian fishing rights, the least restrictive method of preserving the salmon. See Sohappy v. Smith, 302 F.Supp. 899, 911 (D.Or.1969). Their argument in support of this claim merely restirs the evidence adduced below; they continue to assert that any injunction against Yakima fishing only attacks the problem's effect, and not its cause.
 
 
 26
 The rules of civil procedure state that "in granting ... interlocutory injunctions" the court shall make findings of fact, and these findings "shall not be set aside unless clearly erroneous ...." Fed.R.Civ.P. 52(a); Unicon Mgmt. Corp. v. Koppers Co., 366 F.2d 199, 203 (2d Cir. 1966); 5A Moore's Federal Practice P 52.07, at 2732 (2d ed. 1980).
 
 
 27
 Here, the choice of circumstances or events that accounted for the decline in the number of spring chinook, and the selection of the method to alleviate the problem, are clearly the types of findings embraced by Rule 52(a). The Yakimas, having their opportunity to present their case in the district court, may not reargue that factual dispute here. After reviewing the entire record, we are not left with the "definite and firm conviction that a mistake has been committed" necessary to reverse the judgment's factual predicates. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); Agarwal v. Arthur G. McKee & Co., 644 F.2d 803, 806 (9th Cir. 1981). Accordingly, since we have found that the district court proceeded on the correct legal premises and did not abuse its discretion, we affirm the grant of the preliminary injunction.
 
 
 28
 AFFIRMED.
 
 
 
 *
 Honorable Thelton E. Henderson, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Sohappy was an action by individual Yakima tribal members to establish their fishing rights. In 1969, the district court consolidated Sohappy with the action filed by the United States, which had been styled United States v. Oregon. These cases were severed in 1977, and this appeal is a direct descendent of the United States' 1968 action. See generally Note, Sohappy v. Smith : Eight Years of Litigation Over Indian Fishing Rights, 56 Ore.L.Rev. 680 (1977)
 
 
 [2]
 Prior to Washington's intervention, either the Tribe or the individual plaintiffs sought at least five modifications. After Washington's intervention, the Tribe sought modification at least four times; Washington, at least two. The most recent modification occurred in 1979, when Washington applied for, and received, an injunction substantially similar to the one at issue here. That injunction was not appealed
 
 
 [3]
 Anadromous fish are born in fresh water, migrate to salt water where they live most of their lives, and then return to the place of their birth to spawn and die. See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 662-63, 99 S.Ct. 3055, 3062-3063, 61 L.Ed.2d 823 (1979)
 The Columbia River system supports numerous species of these fish. The 1977 agreement covers, in addition to the spring chinook, the fall and summer chinook, summer steelhead, sockeye salmon, coho salmon, shad and sturgeon.
 The district court adopted the 1977 agreement as a court order, and it thus binds all parties to the action. Idaho, a non-party to the agreement, has unsuccessfully sought to be included in the plan's apportionment scheme. See Idaho ex rel. Evans v. Oregon, 444 U.S. 380, 100 S.Ct. 616, 62 L.Ed.2d 564 (1980).
 
 
 [4]
 An "escapement goal" is a target quantity of fish that will safely pass a specific point. These goals are used to estimate the number of fish available for spawning. The 1977 plan sets an escapement goal of 120,000 spring chinook for Bonneville Dam. Assuming this level, the plan then sets an apportionment scheme for all parties
 At the time of the hearing below, the State of Washington submitted affidavits indicating that the spring chinook run would be between 40,000 and 50,000 salmon at Bonneville Dam, or, roughly 33 percent to 42 percent of the agreed escapement goal. This poor run of salmon provided the factual predicate for the court's injunction.
 
 
 [5]
 Washington denominated its motion as one for a "Temporary Restraining Order/Preliminary Injunction."
 
 
 [6]
 The court initially banned all tribal fishing on the Yakima River. This affected traditional Yakima fisheries at Wapato, Sunnyside, Horn Rapids, and Prosser Dams. Fishing on the Klitckitat River was closed for six days of every week. Later, on a motion for reconsideration, the court allowed a limited 72 hour fishery for adult male chinook at the Wapato and Sunnyside Dams. This modification proved unsatisfactory, and the tribal biologist has counseled against future use of a similar plan
 
 
 [7]
 It is undisputed that the 1980 spring run of chinook salmon is over. Since the order below was limited to that run, we must determine whether this action is moot. An earlier appeal in this case was dismissed for exactly that reason. Sohappy v. Smith, 529 F.2d 570 (9th Cir. 1976). See also United States v. Washington, 573 F.2d 1118, 1120 (9th Cir. 1978), aff'd sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)
 We may still hear this appeal, however, under the "capable of repetition, yet evading review" doctrine if the challenged action could not be fully litigated prior to its cessation; and there is a reasonable expectation that the same complaining party will be subjected to the same alleged harm again. Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). See also Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 514-16, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).
 In Sohappy, this court dismissed the appeal as moot because the 1974 run was over and the challenged state orders expired on their own terms at the close of that run. 529 F.2d at 572-73. By contrast, the issues raised here are of an enduring nature; immunity and jurisdiction, for example, go to the very core of the court's power to hear this controversy. Combined with the high frequency with which the parties have sought relief in the district court, see note 2 supra, the likelihood that the immunity and jurisdictional issues will occur again to the alleged detriment of the Indians is virtually certain. Consequently, we find that we have jurisdiction to hear this case.
 
 
 [8]
 This immunity also extends to tribal officials when acting in their official capacity and within their scope of authority. Davis v. Littell, 398 F.2d 83, 84-85 (9th Cir. 1968), cert. denied, 393 U.S. 1018, 89 S.Ct. 621, 21 L.Ed.2d 562 (1969); White Mountain Apache Indian Tribe v. Shelley, 107 Ariz. 4, 480 P.2d 654 (1971); Ziontz, After Martinez: Indian Civil Rights Under Tribal Government, 12 U.C. Davis L.Rev. 1, 6-7 n.37 (1979). Individual tribal members, however, enjoy no such immunity. Puyallup III, 433 U.S. at 171-72, 173, 97 S.Ct. at 2620-2621
 
 
 [9]
 See also White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559-62, 8 L.Ed. 483 (1832); Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 15-18, 8 L.Ed. 25 (1831); Bottomly v. Passamaquoddy Tribe, 599 F.2d 1061, 1066 (1st Cir. 1979); Powers of Indian Tribes, 55 Interior Dec. 14, 22 (1934); F. Cohen, Handbook of Federal Indian Law 122 (1945)
 But see Robertson, A New Constitutional Approach to the Doctrine of Tribal Sovereignty, 6 Am. Indian L. Rev. 371, 373 (1979) (Tribal sovereignty is a "paradox" since it is a concept "without an irreducible normative core.")
 
 
 [10]
 See, e. g., Namekagon Dev. Co. v. Bois Forte Reservation Hous. Auth., 395 F.Supp. 23, 27-29 (D.Minn.1974), aff'd, 517 F.2d 508 (8th Cir. 1975); North Sea Prod. Ltd. v. Clipper Seafoods Co., 92 Wash.2d 236, 595 P.2d 938 (1979)
 
 
 [11]
 See also Namekagon Dev. Co. v. Bois Forte Reservation Hous. Auth., 395 F.Supp. 23, 27-29 (D.Minn.1974), aff'd, 517 F.2d 508 (8th Cir. 1975); Morgan v. Colorado River Indian Tribe, 103 Ariz. 425, 443 P.2d 421 (1968); Martinez v. Southern Ute Tribe, 150 Colo. 504, 374 P.2d 691 (1962)
 In addition, this court and others have stated in dicta the tribes retain the power to consent to suit. Lomayaktewa v. Hathaway, 520 F.2d 1324, 1326 (9th Cir. 1975), cert. denied, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976); Chemehuevi Indian Tribe v. California State Bd. of Equalization, 492 F.Supp. 55, 58 (N.D.Cal.1979); City of Sault Ste. Marie v. Andrus, 458 F.Supp. 465, 472 (D.D.C.1978); Aubertin v. Colville Confederated Tribes, 446 F.Supp. 430, 432 (E.D.Wash.1978).
 The cases cited in text upheld the waiver of tribal immunity due to broad "sue or be sued" causes contained in tribal constitutions entered into pursuant to 25 U.S.C. § 476 (1976). Other cases have held that similar clauses waive the immunity of tribal corporations not exercising governmental powers. Gold v. Confederated Tribes of the Warm Springs Indian Reservation, 478 F.Supp. 190, 196 (D.Ore.1979); Parker Drilling Co. v. Metlakatla Indian Community, 451 F.Supp. 1127, 1136-37 (D.Alas.1978); Atkinson v. Haldane, 569 P.2d 151, 170-75 (Alaska 1977).
 The consent here, however, is much more limited. Both the subject matter and the time of consent have been, and to some extent may still be, controlled by the Tribe. Consequently, the consent here provides fewer problems with respect to possible erosion of tribal sovereignty than in Merrion, Fontenelle or Maryland Cas. Co.
 
 
 [12]
 As noted by an earlier decision regarding municipal sovereign immunity: "Sovereign immunity means only that the sovereign may not be sued without its consent. Implied in that immunity is the power to consent." Bailey v. City of Knoxville, 113 F.Supp. 3, 6 (E.D.Tenn.1953)
 
 
 [13]
 Indeed, the same court that issued the injunction at issue here has held that non-parties may be enjoined from interfering with the res in the court's constructive possession. United States v. Crookshanks, 441 F.Supp. 268, 270 (D.Or.1977). Cf. Mathias v. Lennon, 474 F.Supp. 949, 957 (S.D.N.Y.1979) (New York court in possession of insurance company assets may enjoin non-party policyholders, residing in Illinois, from dissipating assets.) If non-parties may be enjoined from interference, then intervenors, over whom the court has personal jurisdiction, see note 18 infra, may certainly be enjoined from similar acts
 
 
 [14]
 The Tribe also relies upon Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) for the proposition that only Congress may waive tribal immunity. We think this reliance misplaced. There, the Court stated that "(b)ut 'without congressional authorization,' the 'Indian Nations are exempt from suit.' " Id. at 58, 98 S.Ct. at 1676, quoting United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed 894 (1940). The Tribe would have us read this language as excluding the ability of tribes to waive their own immunity. As we explain in text, such a restrictive reading is inconsistent with tribal sovereignty itself
 Martinez, moreover, was concerned with a much more radical proposition than the ability of a sovereign to waive its own immunity; the issue there was whether another sovereign, Congress, could by implication waive tribal immunity. The issue of the tribe's retained power to waive its own immunity simply never arose. Rather than rely on such an ambiguous statement, we choose instead to rely on case holdings and sound policy.
 For the same reasons, reliance on California ex rel. Cal. Dep't of Fish & Game v. Quechan Tribe of Indians, 595 F.2d 1153 (9th Cir. 1979) and Sekaquaptewa v. MacDonald, 591 F.2d 1289 (9th Cir. 1979) is inappropriate. In these two cases, the court merely recited the proposition from Martinez and United States Fidelity & Guaranty Co. that only Congress may waive tribal immunity, before addressing the issues involved: in Quechan, whether Congress implicitly had waived tribal immunity; and in Sekaquaptewa, whether Congress had intended to allow individual participation in suits explicitly authorized by it. In both cases, the parties conceded that tribes were immune from suit without congressional approval, and there were no factual grounds for finding tribal consent. As in Martinez, the issue of tribal waiver of immunity never arose.
 
 
 [15]
 Actually, the immunity only barred tribal liability in excess of the principal claim; the USF&G defendants were allowed to recoup an amount equal to the Indians' primary claim. USF&G, 309 U.S. at 511, 60 S.Ct. at 655; see also Chemehuevi Indian Tribe, 492 F.Supp. at 57-58 n.1. See generally Bull v. United States, 295 U.S. 247, 261, 55 S.Ct. 695, 700, 79 L.Ed. 1421 (1935)
 
 
 [16]
 The language quoted referred to enjoining non-parties. Accordingly, that reasoning is even stronger when the actions of an intervenor are the subject of injunction. See note 13 supra, and note 18 infra
 
 
 [17]
 When a district court has jurisdiction over all parties involved, it may enjoin the commission of acts outside of its district. See Seattle Totems Hockey Club, Inc. v. International Hockey League, 652 F.2d 852, at 854-856 (9th Cir. 1981)
 
 
 [18]
 The court below gained personal jurisdiction over the Yakima Tribe when it intervened as of right. City of Santa Clara v. Kleppe, 428 F.Supp. 315, 317 (N.D.Cal.1976); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1920 (Supp.1981)