# IDAHO ex rel. EVANS, GOVERNOR OF IDAHO, et al. v. OREGON et al.

No. 67, Orig.   Argued November 26, 1979—Decided January 21, 1980

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. STEWART and MARSHALL, JJ., filed a dissenting statement, *post*, p. 393.

*David H. Leroy,* Attorney General of Idaho, *pro se,* argued the cause for plaintiffs. With him on the plaintiffs' exceptions to the report of the Special Master were *W. Hugh O'Riordan* and *John C. Vehlow,* Deputy Attorneys General.

*James A. Redden,* Attorney General, argued the cause for defendant State of Oregon. With him on the responses to the plaintiffs' exceptions to the report of the Special Master were *Raymond P. Underwood* and *Beverly B. Hall,* Assistant Attorneys General. *Slade Gorton,* Attorney General, argued the cause for defendant State of Washington. With him on the response to the plaintiffs' exceptions to the report of the Special Master was *Edward B. Mackie,* Deputy Attorney General.

*Louis F. Claiborne* argued the cause for the United States as *amicus curiae* in support of the report of the Special Master. With him on the memorandum were *Solicitor General McCree, Assistant Attorney General Moorman, Myles E. Flint,* and *Steven E. Carroll.*

Mr. Justice Rehnquist delivered the opinion of the Court.

Invoking this Court's original jurisdiction, the State of Idaho brought suit against the States of Oregon and Washington to secure equitable apportionment of various runs of anadromous fish migrating between spawning grounds in Idaho and the Pacific Ocean. We granted Idaho leave to file its complaint, but left open the questions whether that complaint stated a claim upon which relief may be granted and whether the United States was an indispensable party to the action. 429 U. S. 163 (1976). We later referred the action to a Special Master. 431 U. S. 952 (1977). On February 2, 1979, the Special Master recommended that Idaho's action be dismissed for failure to join the United States, but that the dismissal be without prejudice to Idaho's right to refile its suit at some later date if it is wholly unable to obtain a

remedy through negotiation with Oregon and Washington. Idaho has filed exceptions to that recommendation.

I

The Snake River rises in northwest Wyoming and flows across southern Idaho, eventually turning northward and forming the boundary between Idaho and Oregon for approximately 165 miles and between Idaho and Washington for approximately 30 miles. It then turns westward and enters Washington, whence it proceeds for approximately 100 miles to its confluence with the Columbia River. The Columbia River rises in British Columbia and flows southward through eastern Washington to its confluence with the Snake River. Just below that confluence it turns westward, forming the boundary between Oregon and Washington until it empties into the Pacific Ocean 270 miles downstream.

Numerous species of anadromous fish spawn in the gravel bars of the Columbia/Snake River System. After remaining in their hatch area for approximately two years, these fish migrate downstream to the Pacific Ocean, where they spend anywhere from one to four years. Near the end of their life cycle the anadromous fish return to the Columbia River and migrate upstream toward the waters of their origin to spawn. At issue in the present case are three particular runs of anadromous fish: spring chinook salmon, summer chinook salmon, and steelhead trout. To a significant extent, these three runs originate in, and would return to, spawning grounds within the State of Idaho.

A number of manmade conditions have combined with natural obstacles to deplete seriously the number of fish that return to Idaho successfully. During both their downstream and upstream migrations, anadromous fish originating in Idaho must cross a series of eight dams built and maintained by the United States Army Corps of Engineers. The Bonneville Dam, built in 1938, lies closest to the mouth of the Columbia River.

Fish crossing the Bonneville Dam on their way to Idaho also encounter the Dalles Dam, the John Day Dam, the McNary Dam, the Ice Harbor Dam, the Lower Monumental Dam, the Little Goose Dam, and, finally, the Lower Granite Dam. During their downstream migration, of course, the fish cross these dams in the reverse order.

At each of these dams, a portion of the water is released through turbines used to generate hydroelectric power. Water passing through these turbines is not conducive to either the "smolts" migrating downstream or the mature fish migrating upstream. Each dam is therefore equipped with a spillway, over which smolts can pass, and a "fish ladder," up which mature fish can climb. Because water sent over the spillways or fish ladders is not available to generate power, and because river conditions vary over time, the Corps of Engineers [1] is often faced with a choice between generating power and facilitating migration. Even under optimal conditions, when the Corps can allocate adequate water to the spillways and the fish ladders, those mechanisms themselves will cause a significant number of mortalities among migrating fish.

In addition to confronting these hurdles, anadromous fish afford a catch for both sport and commercial fishermen. The Federal Government regulates the ocean fishery in a zone stretching seaward from 3 to 200 miles from the seacoast. See Fishery Conservation and Management Act of 1976, 16 U. S. C. § 1801 *et seq.* Within the 3-mile limit and throughout their in-river migrations, however, the anadromous fish are the subject of state regulation.

In 1918, with the consent of Congress, Oregon and Washington entered into the Oregon-Washington Columbia River Fish Compact, ch. 47, 40 Stat. 515. The Compact attempts to

---

[1] To a certain extent, the United States Bureau of Reclamation and the Federal Energy Regulatory Commission also exercise some control over water releases. See Report of the Special Master 8.

assure uniformity in the regulation of anadromous fish in the Columbia River by preventing either State from altering its fishing regulations without the consent of the other State. Pursuant to this compact, Oregon and Washington have divided the Columbia River below the McNary Dam into six zones, with Zones 1 through 5 stretching between the Pacific Ocean and the Bonneville Dam and Zone 6 stretching between the Bonneville Dam and the McNary Dam. Idaho has attempted on a number of occasions to become a party to the Compact, but its efforts thus far have been unsuccessful.

In 1968, a number of Indian tribes who fished along the Columbia River brought suit against Oregon to protect fishing rights allegedly granted them under various treaties with the United States. See *Sohappy* v. *Smith*, 302 F. Supp. 899 (Ore. 1969). The District Court concluded that Oregon was obligated to structure its regulations so that the Indians would have "an opportunity to catch fish at their usual and accustomed places equal to that of other users to catch fish at locations preferred by them or by the state." *Id.*, at 910. The suit remained pending in the District Court, and, in 1974, Washington moved to intervene as a defendant. Eventually, the District Court determined that the treaties in question gave the Indians a right to 50% of the fish taken from the Columbia River. The United States Court of Appeals for the Ninth Circuit affirmed this determination. See *Sohappy* v. *Smith*, 529 F. 2d 570 (1976).

On February 25, 1977, the parties in the *Sohappy* litigation entered into a 5-year agreement for managing the fisheries on stocks of anadromous fish originating in the Columbia River System above the Bonneville Dam. Under the agreement, Zones 1 through 5 are open to all commercial fishermen. Zone 6, which extends from the Bonneville Dam 130 miles upstream to the McNary Dam, is restricted for use by Indians fishing pursuant to their treaty rights. A "technical advisory committee" estimates the number of fish in various

runs entering the Columbia River "destined to pass [the] Bonneville Dam." An agreed-upon "escapement" for spawning is subtracted from this total in-river run size; the remaining fish in the run are then allocated between treaty and non-treaty fishermen. Thus, for spring chinook salmon, one of the runs at issue here, the plan sets an escapement goal of 120,000 fish passing into Zone 6.[2] Where the run size exceeds the escapement goal by less than 30,000 fish, no nontreaty fishermen may take spring chinook salmon at any time before the fish pass into the Snake River on the other side of Zone 6. Where the run size exceeds the escapement goal by more than 30,000 fish, nontreaty fishermen may take 60% of that excess while treaty fishermen may take 40%. Other runs of fish are regulated similarly, with a predetermined escapement goal and with the remainder of the fish being divided between treaty and nontreaty fishermen.[3]

In the present suit, Idaho alleges that nontreaty fishermen in Oregon and Washington take a disproportionate share of fish destined for Idaho, thereby depleting those runs to the detriment of Idaho fishermen.[4] It seeks equitable apportionment of anadromous fish destined for Idaho in the Columbia River. Significantly, Idaho does not contend that the Indians' share of anadromous fish should be reduced, but rather seeks to share in that portion of the catch now taken exclusively by nontreaty fishermen in Oregon and Washington.

---

[2] The plan estimates that, under normal river conditions, an escapement of 120,000 spring chinook salmon above the Bonneville Dam will provide 30,000 spring chinook salmon at the Lower Granite Dam, the last dam separating the fish from Idaho's spawning grounds.

[3] For summer steelhead trout, the agreement sets an escapement goal of 150,000 fish passing the Bonneville Dam or 30,000 fish at the Lower Granite Dam. If the run exceeds these goals, the excess is apportioned entirely to nontreaty fishermen. As for summer chinook salmon, the third run at issue here, the agreement states that runs of those fish "are precariously low and do not warrant any fishery at the present time. . . ."

[4] According to Idaho, it has no significant commercial fishery, but only sport fisheries.

The Special Master concluded that Idaho's complaint presents a justiciable controversy, and indicated that he found some merit in Idaho's claim that it was entitled to equitable apportionment. Nevertheless, the Special Master recommended that this suit be dismissed for failure to join the United States Government, which has invoked its sovereign immunity and has steadfastly refused to intervene as a party.[5] In deciding that the United States was an indispensable party to this litigation, the Special Master looked for guidance to Rule 19 (b) of the Federal Rules of Civil Procedure, which lists four factors to be considered in deciding whether a suit can proceed in the absence of an allegedly necessary party. These factors are (1) the extent to which a judgment rendered in the party's absence might be prejudicial to that party or those already parties; (2) the extent to which the court could lessen or avoid such prejudice by shaping the judgment or relief; (3) the court's ability to render an adequate judgment in the party's absence; and (4) the adequacy of remedies available to the plaintiff should the suit be dismissed.

The Special Master concluded that factors (1), (2), and (4) weighed in favor of allowing Idaho to prosecute this suit. Because the United States could not be bound by any judgment rendered in its absence, and because Idaho was seeking no relief against the treaty fishermen for whom the United States acts as trustee, no absent party would be prejudiced by the relief sought by Idaho. Furthermore, the Special Master felt that this suit offered Idaho its only practical avenue of relief. Oregon and Washington had consistently rebuffed Idaho's attempts to join the Columbia River Fish Compact or to otherwise negotiate some sort of accommodation. Nor did it appear that Idaho could intervene in the *Sohappy* litigation

---

[5] The United States has adopted this position despite its repeated concession that Idaho appears to be entitled to some sort of equitable relief. See Memorandum from Louis F. Claiborne to the Solicitor General, reproduced as Appendix C to Idaho's exceptions, p. C–5; Tr. of Oral Arg. 60.

to assert its interest. Given the pendency of the 5-year agreement, the *Sohappy* court quite probably would reject Idaho's motion to intervene as untimely. Moreover, any attempt by Idaho to assert in that litigation an interest adverse to Oregon and Washington might convert that suit into a dispute among the States, a dispute over which the District Court would have no jurisdiction.

Although these factors weighed heavily in favor of allowing Idaho's suit to proceed, the Special Master held that federal interests were so intertwined in this suit that this Court could not possibly render an adequate judgment in the absence of the United States as a party. In particular, the Special Master cited the United States Government's control over the ocean fishery, its management of the various dams along the Columbia and Snake Rivers, and its role as trustee for the various Indian tribes with fishing rights in the anadromous fish at issue here. Balancing factor (3) of Rule 19 (b) against the other three factors, the Special Master concluded that Idaho's complaint should be dismissed. At the suggestion of the United States, however, the Special Master recommended that the dismissal be without prejudice to Idaho's right to reinstitute the suit if it is wholly unable to obtain a remedy through negotiation with Oregon and Washington. In suggesting this disposition, the United States implied that it would intervene in a later action brought by Idaho should Oregon and Washington remain intractable.

## II

Idaho has filed exceptions to the Special Master's report and has asked us to reject his conclusion that the United States is a necessary party to this suit. In deciding this issue, we consider separately each of the federal interests cited by the Special Master as rendering impossible an adequate judgment without joinder of the United States Government.

First, the Special Master noted that the United States controls the ocean fishery on the runs of anadromous fish at issue

here during that portion of their lifespan when they are outside the 3-mile limit in the Pacific Ocean. Nevertheless, we do not understand either the Special Master or the defendants to rely heavily upon this interest as evidence of the necessity for joining the United States Government as a party in this litigation. Idaho seeks apportionment of those fish entering the Columbia River destined for spawning grounds in Idaho. While regulation of the ocean fishery may have some effect upon the total number of anadromous fish returning to the Columbia River,[6] it has little to do with proper allocation of the rights to take those fish once they have entered the river.

Second, the Special Master cited the role of the United States in operating the eight dams that separate the hatching grounds in Idaho from the Pacific Ocean. He pointed out that, at each dam, the Corps of Engineers must allocate water among the turbines, fish ladders, and spillways. Under varying river conditions, this allocation often requires a choice between the generation of power and the survival of migrating fish. The Special Master felt that, without authority to bind the United States to whatever judgment was entered in this case, he could not ensure that any additional fish allowed to pass through the first five fishing zones would ever reach the State of Idaho.

We do not find this consideration a persuasive reason for dismissing Idaho's suit. We can assume, as suggested by defendants, that the eight dams along the Columbia and Snake Rivers are the primary reason why more fish do not successfully migrate back to Idaho. Nevertheless, Idaho stresses that it has no quarrel with the operation of the various dams. It argues, quite persuasively we believe, that greater numbers of fish reaching each dam will, under all but the most adverse

---

[6] The *Sohappy* agreement, however, is "based upon the premise" that the United States, through the Pacific Fishery Management Council, will regulate ocean fishing on the runs at issue here so that the ocean catches will be "essentially *de minimis* portions" of those runs.

river conditions, result in greater numbers of fish crossing each dam. The mortality rate at each dam for any given set of river conditions can be, and has been, estimated and taken into account in apportionment formulas. In the case of spring chinook salmon, for example, the *Sohappy* agreement states that "[u]nder average river flow conditions, 120,000 fish at Bonneville Dam will generally provide 30,000 fish at Lower Granite Dam and 150,000 fish at Bonneville Dam will generally provide 37,500 fish at Lower Granite Dam." If Oregon and Washington fishermen are taking more than their fair share of Idaho-bound anadromous fish, this Court could set aside a portion of those fish for Idaho, taking into account the estimable mortality rate at each dam.

Third, the Special Master cited the role of the United States Government as trustee for the various Indian tribes that fish the runs at issue here. Although, as noted above, the Special Master found that a judgment rendered in this case would not adversely affect the interests of those Indians, he felt that this Court could not render a complete judgment unless it could guarantee that the Indians would not take the fish allocated to Idaho.

As a mathematical proposition, the relief sought by Idaho need not involve the Indians at all. Any particular run of anadromous fish entering the Columbia River destined to pass the Bonneville Dam must be allocated to one of three categories: nontreaty catch, treaty catch, and spawning escapement. Under present practices, as memorialized in the *Sohappy* agreement, nontreaty fishermen conduct their operations almost entirely in Zones 1 through 5. Fish allocated to Indian fisheries and to escapement are then allowed to pass the Bonneville Dam and into Zone 6. The treaty fishermen take their allocation in that zone and allow the spawning escapement to continue upriver. Idaho would have this Court order Oregon and Washington to allow a portion of the nontreaty share to pass into Zone 6 along with the treaty share

and the escapement. According to the Special Master, however, without some control over treaty fishermen this Court could not guarantee that Idaho's allocation would ever get out of Zone 6.

We do not share the Special Master's pessimism. Under the *Sohappy* agreement the Indians are limited to a fixed share of the fish entering Zone 1 and destined for the waters above the Bonneville Dam. Absent evidence to the contrary, we cannot assume that the Indians would violate that agreement by taking more fish than have been allocated to them. Nor can we assume that Oregon and Washington, the other parties to the *Sohappy* agreement, would ignore any such violation. Because the treaty and nontreaty commercial fisheries undoubtedly compete to a certain extent, Oregon and Washington might find it in their own interests to enforce the ceiling on treaty fishing in Zone 6. Finally, should other remedies fail, Idaho might be able to intervene in the *Sohappy* litigation for the sole purpose of enforcing the limitations on treaty fishing. Thus, we cannot agree with the Special Master that failure to join the United States as a party to this litigation would prevent this Court from rendering an adequate judgment.[7]

This case is quite different from earlier cases where we found the United States to be an indispensable party to the

---

[7] The Special Master also implied that he felt dismissal was warranted because of the complexity of apportioning runs of anadromous fish and because this Court might have to retain continuing jurisdiction over the management of the fisheries in the Columbia and Snake Rivers. We rejected a similar argument in *Nebraska* v. *Wyoming*, 325 U. S. 589, 616 (1945), a case involving apportionment of water:

"There is some suggestion that if we undertake an apportionment of the waters of this interstate river, we embark upon an enterprise involving administrative functions beyond our province. . . . But the efforts at settlement in this case have failed. A genuine controversy exists. . . . The difficulties of drafting and enforcing a decree are no justification for us to refuse to perform the important function entrusted to us by the Constitution."

prosecution of a suit within our original jurisdiction. In *Arizona* v. *California,* 298 U. S. 558 (1936), a suit involving the division of theretofore unapportioned water in the Colorado River, we found that the Federal Government already had exercised its authority to impound that water and to control its disposition. See *id.,* at 570. Here, by contrast, the United States has made no attempt to control apportionment of the in-river harvest of anadromous fish, except to the extent that it has acted to protect treaty rights. In *Texas* v. *New Mexico,* 352 U. S. 991 (1957), another suit involving the apportionment of water flowing in an interstate river, we adopted the finding of the Special Master that the United States was indispensable in its role as trustee for various Indians. A decree in that case, however, would have "necessarily affect[ed] adversely and immediately the United States" in its fiduciary capacity. See Report of the Special Master, O. T. 1956, No. 9 Orig., p. 41. In this case, the Special Master specifically dismissed the possibility of prejudice to the United States, either in its role as trustee for the Indians or in its role as manager of the ocean fishery and the dams. Cf. *United States* v. *Candelaria,* 271 U. S. 432, 438, 443 (1926).

Moving beyond the report of the Special Master, Washington has advanced two additional arguments in favor of dismissing Idaho's complaint. First, Washington asserted at oral argument that the *Sohappy* agreement was founded on the assumption that nontreaty fishermen in Washington and Oregon were entitled to take any fish not allocated either to treaty fishermen or to spawning escapement. According to Washington, any allocation of nontreaty fish to Idaho would result in abrogation of the *Sohappy* agreement. See Tr. of Oral Arg. 46–47. The *Sohappy* agreement, however, only divides the available fish between treaty and nontreaty fishermen. It does not purport to allocate the nontreaty share among the various States. Even if the agreement did guarantee Washington or Oregon fishermen any fish not allocated

to treaty fishermen or to escapement, such an agreement could not and should not survive a finding by this Court that Idaho is entitled to some of those fish presently being taken by Oregon and Washington. Moreover, should Oregon or Washington seek to reopen negotiations in the *Sohappy* litigation, an attempt by Idaho to intervene in that litigation might meet with more success than an attempt to intervene in the face of an extant 5-year agreement.

Washington also argues that, at present and for the past several years, few if any fish have been taken from the runs at issue here and that further restrictions on fishing in Zones 1 through 5 will have no appreciable effect upon the number of spring chinook salmon, summer chinook salmon, and steelhead trout arriving in Idaho. This assertion, however, goes to the merits of Idaho's claim and has little or nothing to do with the need to join the United States as a party to this litigation. Idaho's narrow complaint is a two-edged sword. It has sidestepped the need to join the United States as a party by seeking only a share of the fish now being caught by nontreaty fishermen in Oregon and Washington. It now must shoulder the burden of proving that the nontreaty fisheries in those two States have adversely and unfairly affected the number of fish arriving in Idaho. A trial on the merits may well demonstrate that the target fisheries have, in fact, had no effect upon the runs of anadromous fish at issue here. Alternatively, a trial may demonstrate that natural and manmade obstacles will prevent any additional fish allowed to pass out of Zone 5 from reaching Idaho in numbers justifying additional restrictions on nontreaty fisheries in Oregon and Washington. Cf. *Washington* v. *Oregon,* 297 U. S. 517 (1936) (water not used by Oregon would sink into deep gravel in the bed of the river and never reach users in Washington). Neither of these possibilities, however, persuades us that an adequate judgment is impossible without a joinder of the United States Government.

## III

We therefore sustain Idaho's exceptions to the Special Master's report recommending that Idaho's complaint be dismissed, and remand the case to the Special Master for further proceedings not inconsistent with this opinion.

*So ordered.*

MR. JUSTICE STEWART and MR. JUSTICE MARSHALL dissent. Agreeing with the Special Master's report, they would overrule Idaho's exceptions thereto and would order that the complaint be dismissed.